UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6034-CR-ROETTGER



UNITED STATES OF AMERICA,

   Plaintiff,

vs.

JOHN PALMER,

   Defendant.

_____

## MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

  The defendant, John Palmer, by and through the undersigned counsel, moves this Honorable

Court to modify conditions of supervised release, and as grounds would state the following:

  1. The defendant was charged in Count I with an attempt to entice an individual under

eighteen years of age to engage in a sexual act for which any person can be charged with a criminal

offense and in Count II with possession of a computer containing three or more images of child

pornography.

  2. The defendant entered a guilty plea to Count I and the government dismissed count II.

  3. On 1/26/2001, the defendant was sentenced to thirty seven months incarceration followed

by three years of supervised release.

  4. Special condition 4 of supervised release requires the defendant to "participate in sex

offender treatment to include psychological testing if deemed necessary".

  5. The defendant has been evaluated by Stuart E. Brown, ED.D. Stuart Brown holds a

Doctoral degree in Counselor Education/Counseling Psychology from Auburn University, a Masters



degree in Community Clinical Psychology from the University of Louisiana at Lafayette, a Bachelor

of Science degree in Psychology from the University of Oregon and a Juris Doctorate from Florida

Coastal School of Law in Jacksonville, Florida. He is currently licensed as a mental health counselor

in both Washington State and Florida. He is licensed as a certified sexual offense treatment provider

in Washington State (Washington State strictly requires a specific license requiring 2000 hours of

supervised treatment and evaluation experience in the area of sexual offense work in order to

evaluate or treat any level of sexual offender or one accused of sexual offense).

Stuart Brown has over 25 years of experience in the field of sexual offense work including

extensive expert testimony in court (having testified well over 500 times in approximately a dozen

states). He has completed evaluation and treatment of over a thousand individuals found guilty of, or

who have admitted to, sexual offenses (including conducting individual, family and group therapy for

sexual offenders at all levels of severity). He has completed well over 5000 PPG evaluations in

various settings, including prison and civil commitment centers (PPG testing is a physiologically

based methodology which aims to evaluate the sexual arousal preferences, and associated strength of

such preferences, for alleged or admitted sexual offenders). He has assessed sexual offenders as to

the risk of violent and non-violent sexual recidivism while in the community (including nearly 200

individuals detained for possible civil commitment to various state institutions under Sexually

Violent Predator Acts in several states).

6. A copy of Stuart Brown's 13 page report is attached as *Exhibit A*. Stuart Brown feels that

Mr. John Palmer is in serious need of personal and family therapy in order to deal with his confused,

self-destructive thinking and behavior patterns. In Stuart Brown's view, **Mr. Palmer does not need,

nor will he benefit from, sexual offender group and individual therapy**. Despite Mr. Palmer's

behavior leading to the charges in the instant case, Stuart Brown feels that the highly confrontational

and heavily sexually based therapy offered in sexual offender programs, such as the one Mr. Palmer

is presently required to attend, will not meet Mr. Palmer's needs, nor those of his family. It is the opinion of Stuart Brown that Mr. Palmer is likely to be resistant, become more depressed and detached, **and may indeed become suicidal.** Stuart Brown feels that group therapy with well-established sexual offenders/predators is **counter-productive.** Given Mr. Palmer's age (72) and recent cancer surgery and rehabilitation, the highly confrontational group sexual offense therapy is not in the best interests of Mr. Palmer or society.

7. Aldo Morales, M.D., is a psychiatrist who has seen Mr. Palmer as a patient at the time of his arrest in 2000, and has continued to treat Mr. Palmer after his release from prison in December of 2003. **Dr. Morales opines that Mr. Palmer's "participation in community-based sex offender therapy as required as a condition of supervised release is not only inappropriate, but also contraindicated".** Dr Morales feels that, given Mr. Palmer's current status as a post-operative lung cancer patient with significant depression, the stress engendered by traditional (focused) sex offender therapy (in an individual for whom it is not clinically indicated) **decreases his fighting chance for survival.** According to Dr. Morales, Mr. Palmer needs to engage in comprehensive individual, marital, and perhaps family therapy in order to properly deal with his psychological problems. (Dr. Morales' letter to the undersigned is attached as *Exhibit B*).

8. As a result of his recent lung cancer surgery, Mr. Palmer suffers a great deal of pain from prolonged standing or sitting. The group sex therapy sessions last some ninety minutes, causing severe physical pain to Mr. Palmer. Enclosed as *Exhibit C* is a letter from Paul A. Rodriguez, D.O., who is presently treating Mr. Palmer.

9. The undersigned contacted Assistant U.S. Attorney Lawrence Bardfeld who states that he takes no position in reference to this motion.

10. The undersigned contacted U.S. Probation Officer Anthony F. Gagliardi who states that he opposes this motion.

11. The defendant requests a hearing to enable him to present live testimony from the above-named individuals in support of this motion to modify the conditions of supervised release.

I HEREBY CERTIFY that a copy of the foregoing was mailed to Lawrence Bardfeld, Assistant United States Attorney, 500 East Broward Boulevard, Suite 700, Ft. Lauderdale, Florida, 33394, to Anthony F. Gagliardi, United States Probation Officer, 299 E. Broward Boulevard, Room 409, Fort Lauderdale, Fl 33301, and to Patricia Brinson, United States Probation Officer, 6100 Hollywood Boulevard, Suite 501, Hollywood, Fl 33024-7938, this 20th day of January, 2005.

Maury Halperin, Esq.
Attorney for the Defendant
Fla. Bar No: 539252
1326 S.E. 3rd Avenue
Ft. Lauderdale, Fl 33316
(954) 763-7474
Fax No.: (954) 767-0213

*Exhibit A*

**STUART E. BROWN, ED.D., J.D.**
**KEYSTONE EXECUTIVE PLAZA**
**12555 BISCAYNE BLVD., #982**
**NORTH MIAMI, FL 33181-2597**
**954-815-6888 (CELL); 206-728-2425 (FAX)**

December 23, 2004

Mr. Maury Halperin
Attorney At Law
1326 S.E. 3rd Avenue
Fort Lauderdale, FL 33316

Dear Mr. Halperin:

At your request, I am forwarding a summary of the extensive sexual offense risk assessment that I completed for your client, Mr. John Palmer. In addition, I am providing a recommendation as to his future treatment needs and my expert opinion as to what form of treatment would be most beneficial to the community and to Mr. Palmer, remaining highly cognizant that the sentencing court will in fact make any such final decision and determination.

As you are well aware, Mr. Palmer came to me requesting a comprehensive sexual offense and community risk assessment after he had been released from approximately 30 months in Federal Prison, following his being charged with Enticing a minor for sexual purposes (on the Internet) and for allegedly having child pornography on his computer. The latter charge was dropped with the client then pleading guilty to the one charge of Enticing a minor for sexual purposes (over the Internet). Following 30 months in Federal Prison, he was released on December 12, 2003, with a requirement of 3 years of probation and supervision and a requirement to complete community based sexual offender treatment. Based on an evaluation completed by Dr. John Morin, the client was directed by his parole officer to start and complete treatment with Dr. Eric Imhoff. Mr. Palmer started this treatment but then experienced very serious medical problems in the form of diagnosed lung cancer requiring extensive and debilitating surgery from which he is currently recovering and being required to utilize a number of pain killing and anti-infectious medications. Mr. Palmer indicated that while he realizes that he must return to treatment following his recovery and has every intention of doing so, he was very upset and concerned about the nature of the treatment he was receiving and hoped that "in some fashion the current evaluation could prove that he was not a danger to the community and that he could complete treatment that was more in keeping with his actual needs."

Mr. Palmer then completed a comprehensive sexual offense risk assessment evaluation with this examiner (Stuart Brown) over a four-day period during May of 2004 with the entire evaluation consisting of twelve hours of clinical interviews and psychological and physiological testing. The evaluation process included review of the client's legal records; completion of the Millon Clinical Multiaxial Inventory (MCMI-III) Personality Test, considered to be among the best tests of long-term personality functioning; completion of the Hare Psychopathy Checklist (PCL-R) designed to measure the presence or absence of Psychopathy

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 1**

which has been found to predict future dangerousness; completion of a Polygraph test; and completion of a Penile Plethysmograph test (PPG) designed to assess sexual arousal preferences to children, adolescents and adults. In addition, the client recently completed an three hour evaluation update including an updated Penile Plethysmograph evaluation (PPG) aimed at evaluating whether the client presented with any sexual arousal to minor and adult males (the previous evaluation work had focused on assessing any existing sexual arousal toward minor females).

I would offer the following information as to my own background which I believe qualifies me to offer a diagnostic and treatment recommendation for your client. I hold a Doctoral Degree in Counselor Education/Counseling Psychology from Auburn University (1980), a Masters Degree in Community Clinical Psychology from the University of Louisiana at Lafayette (1975), a Bachelor's of Science Degree in Psychology from the University of Oregon (1972), and a Juris Doctorate from Florida Coastal School of Law in Jacksonville, Florida (2003). I am currently licensed as a Mental Health Counselor in both Washington State and Florida, and licensed as a Certified Sexual Offense Treatment Provider in Washington State (Washington State strictly requires a specific license requiring 2000 hours of supervised treatment and evaluation experience in the area of sexual offense work in order to evaluate or treat any level of sexual offender or one accused of sexual offense).

I have over 25 years of experience in the field of sexual offense work including extensive expert testimony in court (having testified well over 500 times in approximately a dozen states); completion of evaluation and treatment of over a thousand individuals found guilty or admitting to sexual offenses (including conducting individual, family, and group therapy for sexual offenders at all levels of severity); completion of well over 5000 PPG evaluations in various settings (including prison and civil commitment centers); and assessing sexual offenders as to risk of violent and non-violent sexual recidivism while in the community (including having evaluated nearly 200 individuals detained for possible Civil commitment to various State institutions under Sexually Violent Predator (SVP) Acts in several States. In short, I believe I am well qualified to access the dynamics and future risk of recidivism on the part of clients such as Mr. Palmer.

**EVALUATION BACKGROUND:**

Mr. Palmer is a 72-year-old Caucasian male who resides in Pompano Beach, Florida with his wife of 27 years (Bernadette) and 12-year-old female daughter (Suzanne). The client presents with a very stable and long-term work history including working as a hotel auditor and manager for over twenty years, followed by his operating his own boat chartering service and contract building businesses for over twenty years. Prior to Mr. Palmer's instant offense in 2000, his only involvement with the law appears to have taken place more than 55 years ago when he was approximately 15 years of age when he was arrested and charged with stealing a car for 'joy riding'. As a result, he was sent to the Nevada School of Industry Correctional Program for 1-½ months, after which he left the State of Nevada and went to reside with his grandfather in New York City. In short, the client appears to have had no adult involvement with the law prior to his current offense, suggesting a complete absence of any anti-social dynamics.

**Description of the current crime**: The client indicated that during January of 2000, he was charged initially with enticing a minor for sexual purposes over the Internet and having child pornography on his computer (later dropped). He noted that the authorities found 5 pornographic pictures on his computer that he claimed were unsolicited e-mails of which he was not aware. In recounting his description of the crime, Mr. Palmer reported that in the period leading up to the millennium celebrations of 2000, he experienced a number of events which caused him to feel increasingly depressed including the

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 2**

cancellation of a long planned family sailing trip to the Caribbean as a result of his wife's father developing serious heart problems, necessitating his wife and daughter traveling to Chicago to be with his father in law. The client admitted that he had had a serious drinking problem that became exacerbated when he became depressed as then occurred during the week that his family was gone. When asked why the cancellation would cause such extreme depression of his part, he responded by noting that he was greatly looking forward to the opportunity to spend extensive quality time with his daughter as he had felt very badly that he had not been emotionally available to her prior to that time in her life due to his very busy work schedule. The client essentially admitted that he had actually been lonely and emotionally isolated for some time prior to the weeklong events that led to his arrest. He reported, "I never had been involved in sexual chat rooms or pornographic sites at any time in my life before. I went to computer sites as I was really interested in learning about parenting issues and learning about kids in general as I wanted to be the best father I could be for my daughter. My relationship with her was really important to me. Looking back at that time, I realize that I was lonely and drifted to adult chat rooms with heterosexual women, wanting to talk to someone."

As a function of the evaluation, this examiner completed a comprehensive psycho-sexual and relationship history taking in order to determine and trace the causes of his instant offense acting out behavior, and specifically to determine if the client did in fact present with any risk of future acting out against minors. Throughout the evaluation, the client presented with a consistently open, candid and forthcoming style, candidly admitting that he had had a sexual affair starting a short time his wife and daughter had left town to be with his father-in-law. He noted that he had met a woman on-line just before the New Year and then met her in a local hotel for several sexual encounters. He reported, "She brought up the idea of light bondage activities as this was part of her sexual interests. I had never been involved or interested in such things before and I decided to give it a try. I think that I was just out to discover parts of life I had missed as I was getting older and time was running out." She knew where to go to be involved with others with bondage interests. There were a lot of 'freaky' people there. I am a people watcher and I must admit I found it interesting. She wanted me to handcuff her and tie her feet together. She seemed to like this but it did not do anything for me. It was like watching a documentary. She was orgasmic and I found this all pretty interesting." The client appeared to suggest that these activities somehow helped him separate himself from depressed and lonely feelings and helped him feel 'excited' again about life in some manner. As noted below, this intellectualizing and emotionally distancing himself from rather intense interpersonal events and relationships, does appear to be a genuine part of this man's personality dynamics. They appear to serve as an insulating and protecting mechanism to allow him not to confront behaviors, which are contrary to his value system, and to also protect against experiencing guilt as to such acting out behaviors. In essence, the client appears to be genuinely dissociated from intense and dynamic interpersonal behaviors while defining himself as a somewhat detached outside observer akin to a scientist engaging in research. At the same time it is psychologically very apparent that these behaviors are serving deep unmet emotional and psychological needs (in this examiner's professional opinion).

In further describing the events leading to his arrest, he continued: "The problem developed over a 4-5 day period. I branched out on the Internet and was exploring various sexual chat lines with many different subjects starting with sexual bondage after my affair (see above)." The client reported that he began to observe that some of the chat lines referred to adults having sex with children. He reported that he was shocked and disgusted that there were such blatant references to sex with children that were apparently legal. "My daughter would soon be entering the difficult adolescent period and I wanted to know how children were effected by this behavior and what they had to say." I was 68 at the time and really out of touch with what kids want and how they saw things these days. I was trying to get an education and get in

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 3**

touch with the generation issues. I was not interested in children in any manner in terms of sex with them. I had a good relationship with my daughter and just wanted to be the best father possible."

"I eventually got to a child to adult chat room line. I think it was probably called 'barely legal' or 'children that liked older men' in the South Florida area." At this point, the client was questioned extensively as to any history relating to sexual interests, proclivities or past sexual behaviors with children. He adamantly denied such interests or behavior and claimed that he had never masturbated to a fantasy of a child or had any sexual contact with a child. The client pointed to his lack of any secrecy during the events that led to his arrest as circumstantial evidence that his motives were not inappropriate or sexually driven. "I always gave my right name and phone number. I never disguised myself. I sent a passport picture in the scanner when they asked for my picture. I felt at all time that I could bear examination by the police and that anyone that reviewed me would know that I was not doing any harm. I know now that this was stupid but I knew that I was not doing anything wrong and really wanted to do something good to protect children, as crazy as that may sound to others."

When asked what he discovered through his involvement with the child sexual chat lines, he noted, "I was shocked to discover the extent of the sexual behavior going on. They were looking for sugar daddies and the kids would say they were between 12-18 years of age. It was blatant and they would brag about their experience. I believed that I had to be explicit and even vulgar to keep them involved as I found that I would quickly be shut down by whoever was on the other end if I acted as if I was questioning the morality of what was going on. I realized that they must have been on the lookout for anyone acting like the police. I pretended to be a wealthy man looking for little girls and developed a persona. I was reactive to what they said and wanted. Some would send pictures of themselves. One mother sent a picture of her minor daughter in the nude and another mother sent a picture of her 14-year old daughter having sex with an older man and the mother wanted $2,000 for him to have sex with the child." Upon questioning, the client denied that he had any sexual intent or sexual interest when he became involved in the chat lines involving children. This examiner does note that the client appeared to be remarkably naïve as well as emotionally detached as noted above, when describing the critical events here.

When asked how the process then generated to his meeting a real person as opposed to talking over chat lines, he responded, "I was talking to a 16-year-old female that wanted a sugar daddy. She told me that she had a brother who was being abused by an uncle and she wanted me to talk to him about sex and educate him so he would know that what was happening to him was wrong. She told me that I should not let him know that I had talked to her but that he would be on-line at about 5:00 PM that evening and that his name was Ritchie. I waited at home on the chat line and he came on line at the planned time asking if there was anyone there (on-line) from Fort Lauderdale. The thought of how this would look never occurred to me. Besides, I was following his lead as far as sexual talk. I would tell him what I thought was right or wrong. He told me that he wanted a smart leather jacket and a scanner and would agree to be with me sexually in return. I said I would be glad to provide it to him. I never agreed to the sex portion of his agreement, as I of course had absolutely no interest in sex with him or any minor. However, I did engage in enough sexualized talk with him in order to keep him interested and convince him that I was not working for the police. I was trying to snare him and understand how he was thinking to turn him into his parents and be of help in dealing with other so affected minors. I was thinking at the time that I wanted to protect my daughter and kids like her. I then had two conversations by phone with him and he suggested that I meet him in a park. I told him that I had a hotel room where we could meet. He would not let up and was sexually explicit with me and wanted to know what we would do in the hotel room. I was not explicit. I said, We'll see. I drove to the park and he was standing on the basketball court. It turned out that 'Ritchie' was actually a policewoman who had her hair inside a baseball cap. 'Ritchie' had said he

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 4**

would be wearing a NY Yankees baseball cap and so I stood near my car and yelled to him to come over and was arrested." It is noted that in discussing the case with the client, this examiner discovered that the transcripts relating to the above phone conversations, which actually involved police undercover agents posing as minors, do not include any evidence of statements made by police agents posing as female minors, in contradiction to the client's statements. When questioned regarding this issue, the client steadfastly maintained that he had spoken at length with someone posing as a female teenager. He thus noted that he presumed this portion of the transcript had not been provided during the investigation for some unknown reason. He steadfastly denied that he had any sexual interest in males and again had gone to meet "Ricthie" only to "snare him to turn over to his parents." As a result of this issue, an updated PPG evaluation focusing on male minors was later added to the evaluation as noted above.

The client reported that prior to this incident, he had already met in person with two 15-16 year old females that he had spoken to on the chat line. He noted that he met them both while pretending to have some interest in them sexually and then called their parents once they met with him and "turned them over to their relatives." The client indicated that he had told the police about these other adolescents upon his arrest but noted that they did not appear to have interest in what he was saying or did not believe him. Again, there is little question in this examiner's view that the client was suffering from serious levels of depression and seeking some means to escape such feelings through both drinking and then entering into some world of excitement and psychological escape. The client noted that soon after his arrest, his case was soon being played on all of the TV stations. "I believed by then that I had an alcohol problem and checked myself into an alcohol treatment center (after getting out on bail) I was drinking starting in the morning and thought that if my judgment was so off with how others would perceive what I was doing, maybe I had a serious drinking problem. I had checked myself into a treatment center 10 years before as I had been drinking too much back then and had stopped drinking for a year at that time." Again, the client appeared relatively detached and unaware in terms of the impact of his long-term alcoholic problem on his personal life and with virtually no understanding of the 'anesthetic effect' that alcohol played in his personal and psychological functioning. The client reported that he had begun to see a Psychiatrist prior to the time that he was sent to prison and began taking anti-depressant medications.

**Other Pertinent Sexual History Issues:** The client completed a comprehensive psychosexual history and appeared quite candid in his reporting based on a number of 'negative' or potentially damaging self reports indicated below: The client denies any previous sexual involvement with children at any time; denied ever masturbating to any fantasies involving minors; admitted that he had had one homosexual experience while receiving a message with a male masseuse noting that he had been drinking heavily at the time; admitted to sexual encounters with a half dozen female masseuses while receiving a message; admitted to having sex with approximately ten prostitutes over the past 10-12 years; reported having three affairs during his current lengthy marriage; and denied that he had ever downloaded child pornography, noting that the police had found images of 5 nude children on his computer that he received in an unsolicited manner. He denied ever sending others pictures of himself in the nude. He claims that he has never taken any pictures of children in the nude including his daughter.

## DEVELOPMENTAL HISTORY ISSUES:

This examiner completed a very comprehensive developmental and relationship history as a function of the current evaluation that is available upon request. For purposes of brevity, only a brief summary will be included here. The client reports being married 3 times with the first coming when he was 20 years of age. "I met my first wife in New York City and her name was Rita. We were married for 2-3 years. She was cheating on me and I later found out about this. We had two children but I have not seen them after I

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 5**

left the area many years ago." The next woman of significance in the client's life was Jeanne Smith, whom he reportedly met while he was in the hotel business in 1956 in Atlantic City. He noted that he was the resident manager of the Ritz Carlton Hotel. "She was 7 years older than me and she died in 1997. We never married but lived together for about two years and had 2 children including Paul who is 41 and has a computer business in Atlanta, and Robert who is 42 and is a professional musician." The client notes that he has not had contact with Robert for many years. "I supported them both financially and put them in military school while Jeanne raised them. Jeanne was an alcoholic and the kids were in a boarding school for 6 years until the 8th grade. I later gave Jeanne a job in the hotel that I was managing and gave her an apartment and the boys were living there although I did not act as a father to them. Jeanne and I split for good after the 3 years we were together and were not romantically involved again after that time.

The client reports that his second wife also had worked for him in a hotel that he managed in Chicago while she worked herself through college. "She then obtained a position with Pan Am Airlines and we were going to fly around the world for a vacation. She told me we needed to marry for him to get the family benefit for flying with Pan Am. We became involved romantically in 1967 and went around the world in 1969 when we were married. We never really lived together as she had her own place and I had mine. She took it as a marriage. She had emotional problems of her own with suicide attempts and hospitalizations for emotional problems. It ended as I had other interests in wanting to see other women and was not really committed to marriage."

The client reports meeting his current wife Bernadette when she was working for him at the hotel he managed. He notes that he became romantically involved with her in 1976 when she was 22 years of age and married her in 1977. They have remained married for the past 27 years. When asked to describe Bernadette's prior sexual experience, the client reported that he was her first lover and to his knowledge he is still her only lover. When asked to describe what kind of sexual partner she was for him, he stated, "She would seldom instigate sex but never turned me down." Upon further questioning it appears to this examiner that the client in fact may have felt that something was missing in his life given the apparently lower sex drive and sexual experience of his wife (examiner conclusion). The client himself appeared dissociated from any possible connection between his own sexual acting out behavior during his marriage and his wife's lowered sexual interests. As noted below in the conclusions section, it may very well be that the client has been seeking some sort of sexual excitement to feel alive, passionate, meet needs that have been missing in his apparently routine sexual relations with his wife, and most prominently to deal with strong underlying depression which has likely lasted his entire adult life and appeared to accelerate as he faced the aging process and his growing sense of worthlessness (examiner conclusion).

**Early Childhood Development:**

The client reports that he was born in New York City and lived with his father (John) who died in 1962, and with his step-mother (Etheline) who also died in about 1962 as well. He notes that his natural mother was not in his life after his birth and he met her for the first time when he was ten years of age. According to the client, his banker grandfather engineered the marriage to his father so the client would not be a bastard and then had her (his natural mother) exit his life and turned him over to his father. When he finally met his mother when he was ten years of age, he reports being angry with her for not being in his life. He saw her briefly only one more time when he was 14 years of age. The client reports that neither his stepmother nor father were significant people in his life. Instead, he notes that his paternal grandfather, Robert Martin, was the most significant person in his life and someone that made him feel good about himself just by being with him. In describing his father, the client stated: "He was a heavy drinker, started a number of businesses, never really had time for me, was not nurturing, and told me what

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 6**

to do and I did it. I never went to him for advice. I am sure that my grandfather was disappointed in my father and I believe that he looked to me to be a sort of son replacement for him. My grandfather died when I was 19. As to my stepmother, I was a necessary evil for her as she had her two daughters whom I did not see as my sisters. She was not very nurturing. She also drank a great deal. My grandfather was my whole world for a long time."

"I had no legal problems while living on the East Coast. My parents moved to Reno in 1945 when I was 13. My father had some business idea and we went and I was required to move with them. They did not ask me how I felt about the move or if I wanted to go. Once in Reno, my life fell part. I wore a tie and shirt to school, as was my custom after having been raised in New York and socially conditioned by my grandfather. In Reno, however, I looked like a fool and they made fun of me. I quit school within the first year as I was shunned as a city kid. The entire process was painful for me. My parents just let me quit at 14-15. I got a job delivering for a drug store with my bicycle. I drove a truck for a florist and then got in trouble with taking and joy riding in vehicles (see criminal history) after hanging out with the wrong group of kids. After I got into trouble with the law in Nevada and was sent to a youth correctional program, my grandfather intervened and I was then taken back to New York to live with my grandfather." The client reported that his grandfather died when he was 19 years of age, by which time he was living on his own in New York and then met his first wife Rita. The client reports he was drafted at 20 years of age during the Korean conflict for two years and was sent to Fairbanks, Alaska.

He reports that he began attending New York University and started working nights in hotels. He began to feel that he was quite good in this area after he had been a night auditor at a very good hotel in New York and was recognized as such. He became general manager at the Hilton in Chicago making $70,000 a year but eventually burned out by working 70 hours a week which precipitated his going to the Caribbean in the late 1970's.

## DRUG & ALCOHOL HISTORY:

The client reports that the first time he used any illegal drug was in the form of Marijuana in about 1950 and the last use was about 8 years ago. He notes that he smoked Marijuana socially and states that this helped him relax. Since his marriage to Bernadette he estimates that he has used Marijuana a total of about 10 times. He then reported candidly that he used Cocaine for the first time in the 1960's and he used the drug a total of 4 times in his life with the last use in the 1970's. He reports no other use of drugs.

In terms of alcohol use, the client indicated that he first felt that he had a problem at about 50 years of age. While reporting no DUI's or alcohol related legal or work problems, he reports that he knew he had a problem developing as he was starting to drink early in the day on a regular basis. "I tried to cut back or abstain for a few months but could not. The first time that I checked myself into a treatment setting for alcohol was in the early 1990's, completing a 21-day hospital program. I was worried, as I could not stop from using alcohol. Every social situation I was involved in involved alcohol, as did all of the social events on the boats. No one told me I had a problem but I realized that I was not in charge anymore." The client reported that he remained alcohol free for about several years after this treatment experience noting that he always felt that he had a physical addiction that could come back. He reports he then began to drink regularly again after a serious financial setback after a hurricane ravaged his property In the Caribbean, resulting in his return to the United States. The client reported that from 1995 to the time of his arrest in early 2000, he drank progressively more. "The drinking made me not feel, although I am not sure what I was trying to escape from feeling." When pushed on this issue he noted that "I was getting older and perhaps was not comfortable with this reality of aging, felt the waning of my skills and abilities,

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 7**

felt I had not reached the place I should at my age, felt I had not achieved the security I wanted for my family, and felt that maybe I never did things as well as I should. The alcohol facilitated something for me. It was an illusion but it worked. I drank heavily until the day I went to prison. I have not had any alcohol since the day I went to prison. I was suicidal before I went to prison."

## SEXUAL INTEREST/AROUSAL TESTING:

As a function of the current evaluation, the client was required to complete a PPG examination. PPG testing is a physiologically based methodology, which aims to evaluate the sexual arousal preferences, and associated strength of such preferences for alleged or admitted sexual offenders. A PPG was completed on May 30, 2004. The evaluation consisted of nine approximately 4 minute audiotape scenarios or stories with age correlated slides of nude female children or adult females (computer generated) shown simultaneously with the audiotape scenarios. The scenarios and associated slides depicted an adult male engaged in sexual behaviors with female children, adolescents and adults in four age categories as follows: 1) very young female children from 3-7 years of age; 2) young female children from 8-12 years of age; female adolescents from 13-16 years of age; 4) and adult females 18 years of age or older. These scenarios included scenes depicting an adult male engaged in "gentle" sexual behaviors with a "willing" minor or adult female, and scenes depicting an aggressive and domineering adult male engaged in rape behavior with female minors or adults in each of the above noted age categories. An additional consenting adult heterosexual scenario was included depicting an adult male engaged in consenting sex with a wife figure, given that the client is married. Finally, as noted above, an additional PPG examination focusing on possible attraction to male minors and adults, was completed on December 19, 2004, in order to assure a comprehensive arousal assessment of both males and females of all ages. This secondary PPG evaluation included five scenarios with accompanying slides of nude males, and presented an adult male engaged in sexual acts with male children from 3-7 years of age; male children from 8-12 years of age; male adolescents from 13-16 years of age; and male adults. In addition, the client was presented with a graphic videotape depicting two male adults engaged in consenting sexual acts.

**Testing Results:** The client was highly cooperative during both PPG tests and evidenced no overt indications of resistance or oppositional behaviors during the entire testing process. In addition, the client presented with no evidence of any faking, attempts to distort his sexual arousal, or other attempts to manipulate or change his sexual arousal. In terms of actual test results, there were no significant responses or near significant responses noted to any form of stimuli regardless of the age or sex of the model presented and regardless of the presence or absence of any force utilized. The client's highest response was at the 6% level to a scenario depicting an adult male engaged in consenting sex with an adult female wife figure. However, this level of arousal fell well short of reaching any level of significance. The client's responses to all other scenarios including all of those to male and female minors were at or near the zero level suggesting no arousal interest to children of any age level. However, given that the client failed to achieve any level of significance during the entire test, making any final conclusions as to arousal patterns would be inappropriate. Perhaps the best that can be said is that when faced with powerful stimuli relating to sex with children, the client did not present with any level of arousal whatsoever to any such deviant stimuli although also failing to achieve any significant level to any stimuli.

## PERSONALITY ASSESSMENT:

**The Hare Psychopathy Checklist Revised:** Psychopathy is a term which is used interchangeably with sociopathy and refers to a personality syndrome that predisposes individuals toward antisocial behavior

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 8**

and, frequently, Antisocial Personality Disorder (APD) as listed in the DSM-IV. Robert Hare's Psychopathy Checklist (Revised), or PCL-R, is currently viewed as one of the best professional instruments to measure the concept of Psychopathy. It should be noted that the authors of this instrument differentiate the concept of Psychopathy from Antisocial Personality Disorder, noting that psychopaths are a subset of those with Antisocial Personality Disorder and have a characteristic pattern of interpersonal/affective and behavioral symptoms. Interpersonally, psychopaths are grandiose, egocentric, manipulative, dominant, forceful, and cold-hearted. Affectively, they display shallow and labile emotions, are unable to form long-lasting bonds to people, principles, or goals, and are lacking in empathy, anxiety, and genuine guilt and remorse. Behaviorally, psychopaths are impulsive and sensation seeking, and they readily violate social norms (e.g., criminality, substance abuse, and a failure to fulfill obligations and responsibilities). The PCL-R measures 20 concepts, and the authors of this measure suggest a clinical cut-off score of 30 for a diagnosis of Psychopathy.

The client achieved a score of 15 (out of 40) on the PCL-R, which places him at the 26th percentile and indicates that he has a low and insignificant level of psychopathic traits and certainly nowhere near the cut-off level for Psychopathy. Again there is no indication suggestive of Psychopathy or Anti-social Personality Disorder based on this test. As such, we certainly have no support for the notion that the client is in any way predatory or seeks out victims in any sense of the word.

**Millon Clinical Multiaxial Inventory (MCMI III)**: The MCMI-III is considered to be a highly valid test of long-term personality development. The test measures dynamics relating to anxiety, depression, rage and hostility, anti-social tendencies, psychotic behaviors and cognitions, withdrawal tendencies, etc. The test includes complex validity scales that allow the clinician to determine whether the client has responded with tendencies to either pay little attention to the questions or to attempt to "fake either good or bad" in terms of personality functioning. In effect, these scales allow some determination as to whether the obtained results on the actual clinical scales can be accepted as valid and worthwhile in assessing the dynamics of the client. The results are reported below:

The client's validity scales noted that the client had answered the questions in an honest and direct fashion suggesting no evidence of faking or attempts to distort the outcome to make himself look either better or worse. As such, the below clinical summary is deemed to be a valid interpretation of the client's current level of psychological functioning and of his long-term personality functioning:

"On the basis of the test data, it may be reasonable to assume that the client is exhibiting psychological dysfunction of a mild to moderate severity. His profile suggests that he is fearfully dependent, socially anxious, self-demeaning and dejected. He is hesitant about asserting himself, may lean on others for guidance and security and normally assumes a passive and self-sacrificing role in many relationships and settings. Notable may be his lack of initiative, his avoidance of adult forms of autonomy, and his willingness to accept blame and criticism. Unusually dependent and insecure, he may feel vulnerable if he does not receive the support from those who usually provide it. Fearful of rebuff by others, he may withdraw from what he experiences as painful social relationships to prevent himself from expressing resentment. His insecurity and fear of being left to his own devices may underlie a superficial quiet, non-disclosing, and benign attitude toward his problems. Apart from extended periods of dejection and helplessness, he is extremely conciliatory and even ingratiating. Moreover, by submerging his individuality, subordinating his personal desires, and submitting at times to abuse and intimidation, he hopes to avoid humiliation and rejection. This man's reported feelings of apathy and weakness and his tendency to succumb easily to physical exhaustion and illness may reflect a persistent and chronic dysthymia (low to moderate level of depression). Plagued by doubts, expecting the worst, and repeatedly

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 9**

undoing opportunities to better his circumstances, this man seems to create life stressors that promote the worries and anguish that characterize his general anxiety state.

A pattern of depression is an integral part of his characterological structure. Preoccupation with concerns over his personal adequacy and worthiness, pervasive self-doubts, and feelings of guilt are all part of a constellation of long-term features of his psychological makeup. A reasonable conclusion from his test responses is that this man experiences continued and repeated episodes of alcohol abuse. Anxiously troubled, lonely, and socially apprehensive much of the time, he appears to turn to alcohol to fulfill a number of otherwise difficult to achieve psychological functions. Alcohol not only may serve to medicate his social anxiety and thereby temporally enhance his confidence, but may also help him relate more comfortably with others by bolstering his self-esteem and well-being. For him, alcohol provides a quick dissolution of psychic pain, a method for blotting out awareness of his loneliness and troubled existence."

## BEHAVIORAL INFORMATION AND SUMMARY:

First and foremost, it should be noted that the client presented throughout the extensive and lengthy evaluation as being honest and straightforward, appeared genuine and candid in responding to all of this evaluator's questions and tasks, provided this evaluator with numerous details regarding his thinking and behavioral process that may be viewed as damaging and not supportive of his case (thus supporting the hypothesis that he indeed was being very honest), did not present with any form of hostility or anger during the evaluation, and in essence was highly cooperative in all respects. While no intellectual testing was completed as a function of this evaluation, it is abundantly clear that the client presents as a very bright man with above average intelligence. He presents as being quite verbal and with high levels of abstract thinking. The client presents with no evidence of any form of thought disorder, delusional thinking, psychosis, cognitive slippage, or other evidence suggestive of any serious or even moderately serious emotional or mental disorders.

Having stated the above, there is no question in this evaluator's view that this client presents with long-term moderate to severe depression that has been masked with varying degrees of relative success over the course of his lifetime and which has recently been exacerbated as the result of a number of factors including his incarceration, and by the aging process with which the client clearly struggles in terms of his evaluation of his life accomplishments (or lack thereof in his view). The client also presents with a very clear and characteristic style of psychological and interpersonal functioning that has also likely been in place for most or all of his adult life with fluctuations in terms of the degree of rigidity that exists at any one time. Overall, the client appears to be an emotionally and psychologically well-guarded individual who is highly detached and both consciously and unconsciously, highly self-protective. Put in different terms, the client appears to have developed a very elaborate and entrenched defensive system that operate both at the conscious and unconscious to protect him from his own great insecurities and against actual or imagined rejection, criticism, humiliation, and lack of caring from others. As noted below, this appears to have developed systematically over the years starting with childhood and extending into adulthood as his inability to develop close emotional relationships with others in his life, persisted. As well stated and analyzed in the client's MCMI-III personality test results above, the client clearly appears to have developed an attachment disorder, which "serves" the self-protective defense system noted here. That is, he appears to remain detached, and highly dissociated from an emotional and psychological standpoint, maintains an almost "observer status" as to life and relationships, and appears to have great difficulty in allowing himself to get close to others for fear of revealing his own insecurities and sense of personal vulnerability to being hurt by others.

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 10**

Alcohol appears to be very much a part of his defense system allowing him both to ignore many unwanted and unacceptable thoughts and feelings, while also giving him the "social courage" to feel comfortable in normally uncomfortable settings and also allowing him a means to vent his resentments in what he views as a safe manner. In addition to the obvious depression and anxiety that likely have co-existed for many years, this man is undoubtedly a very sad and guilt ridden man as well. The client's childhood appears to be marked by detached parental figures likely incapable of inspiring confidence or a sense of caring, with his grandfather being the only figure to have emotionally attached to him.

In terms of his relationships in his adult life, it appears that discovering his first wife had been with other men, may have further crystallized his internal belief that he would be rejected by others and that he thus should not allow himself to get close to others. It is likely that he felt a great deal of rejection and hurt and likely began to weave an increasingly protective layer to avoid such hurt again in the future (after his first failed marriage). Tracing the client's relationship history following the end of the first marriage, it appears to this examiner that the client developed a "safe" process for meeting females and avoid being hurt once again. The client's next two significant relationships resulted from his meeting women working at his hotel. Review of his next two serious relationships which both lasted only several years, appear to be of a "quasi marital" form with the women appearing to want more than the client was willing or able to give and marked by a distancing of the client in the relationship.

The client's third and present marriage appears in many ways to be a replication of earlier relationships in many crucial respects. While it is certainly valid that the marriage has lasted 27 years, it appears clear that this partner has not (based on the client's own words) supplied the stimulation, passion and excitement that he appeared to want out of life. He thus is left without the excitement of a partner seeking him out and finding him sexually and romantically exciting at some level. While he thus likely achieved protection from hurt and rejection, he also likely failed to receive the form closeness he secretly coveted. The arrival of his daughter in the early 1990's likely served to provide needed "cement" for the relationships. It is noted that as a function of this evaluation, this examiner met with the client's wife for several hours. She confirmed the client's report that she has never been a very sexual person and became even less so after a serious injury relatively early in their marriage.

His sexual acting out history during his 27-year-marriage (infidelity) speaks volumes as to his true feelings. As noted above, the client had multiple affairs, saw prostitutes with some regularity, used massages as a further means to gain sexual access with others, and in short regularly betrayed his marriage while justifying his behavior at some level as being insignificant. As noted above, the on-going struggle with alcohol abuse marks the emotional and psychological battle that likely raged at both a conscious and unconscious level as his unmet needs and personal frustration and sense of growing failure appears to have mounted. The client's secret world and inability to deal openly with his growing emotional and psychological problems likely led to a larger and larger gap between the two worlds that the client inhabited. The more he acted out, the more he likely felt some guilt and worthlessness and the more he felt compelled to distance himself emotionally from his wife and others. The genesis of a sexually compulsive lifestyle was thus generated at some level many years ago.

It is very likely that both alcohol and sexual behaviors provided the client with a secret means of escape from his troubling daily existence. While the client sadly sees his problems as starting on the week that his wife left to see her ailing father, this obviously is far from the actual reality but consistent with his psychological need to protect and defend his fragile ego at this point. The dynamics being described here still of course exist for the client and as noted below, do require treatment, in that even at this date after the sad ordeal experienced by the client and his family, he has been unable psychologically to tell his

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 11**

daughter or wife the full truth of what has occurred (although this process was started as a function of this evaluation process and needs to continue in this examiner's professional opinion). Consistent with his long-term past dynamics, he instead continues to engage in fantasy and wishful thinking, somehow believing that his daughter does not know what transpired or was not damaged by his behavior (or his wife). The notion that his daughter can be dealt with by telling her that he was in a hospital for 30 months for a back problem with no contact with her during that time, says all that is necessary in terms of the very tragic emotional gulf that separates this man from significant others and them from him. His sadness and depression thus remain untouched without any meaningful personal and family therapy. In short, all members of the family are in serious need of family and personal therapy.

**Recommendations:**

**It is important to recognize again that in this examiner's view, the client was not, and is not attracted to children or a threat to children per se.** The results of the current testing, (psychologically, clinically, PPG results in terms of no arousal to children) as well as a complete absence of any historical data which suggests any arousal or attraction to children, **all strongly suggest that this man is not a sexual predator and is certainly not a pedophile in any manner.** What transpired with this client in this examiner's view is the result of a largely unconscious process where a developing compulsive cycle marked by sexual and alcohol elements, led him to involvement in a form of titillating escape adventure. As the client further entered the world of Internet sexuality, he appears to have utilized alcohol to enhance his personal excitement, which thus further cut him off from reality thus allowing an escape from his depression, fear of aging and death, and feelings of failure. While this process of course represents the classic development of a compulsive behavior that had sexuality as a major component, this evaluator simply does not view this process as being indicative of pedophilia or hebephilia (attraction to adolescents) requiring classic sexual offender treatment.

**Treatment Issues:**

Based on the above analysis, it is very clear to this examiner that the client (as well as his wife and daughter) is in serious need of personal and family therapy to deal with his confused, self and other destructive thinking and behavior patterns which have resulted in his reaching the current point in his life. He is depressed, very dissociated, resides with a wife and child in what can only be described as a tragic and emotionally troubling and detached relationship, perceives himself as a failure, has few skills to understand how to deal with the many complex parenting and marital and personal issues in his life, and is "running out of time" in terms of his life ad health. At the same time, based on this examiner's many years of personally conducting very highly confrontational group sexual offender groups, **he does not in this examiner's view, need or will likely benefit from, sexual offender group and individual therapy.** Despite the client's behavior, this examiner suggests (based on 30 years of sexual offender group and individual therapy) that the highly confrontational and heavily sexually based therapy offered in sexual offender programs, will not meet this client's needs nor that of his family. In fact, the client is likely to be resistant, become more depressed and detached, move further from where he needs to be psychologically and emotionally to give up his well-entrenched defenses, and may indeed become suicidal as he is "outed" by force or pressure. More pointedly, he requires long-term personal and family therapy to deal with the many issues raised above which largely do not involve sexual issues. Given that the client does have three years of probation, he could thus be required to attend such therapy that would be highly beneficial to his family as well and be much more likely to be accepted and be helpful to the client. This examiner suggests that the client (and his family) meet with a therapist who is very knowledgeable of sexually compulsive issues but is also well versed in family and personal therapy issues dealing with

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 12**

depression, personal defenses, and anxiety. Dr. Patrick McGinnis has been recommended to the client as one such excellent resource. The client (and his wife) appears willing to accept such treatment. Again, this examiner suggests that three years of group therapy with well-established sexual offenders/predators is simply counter-productive for this man and his family (who are likely to be ignored and isolated in any classic group sexual offender treatment). Given his age and recent cancer surgery and rehabilitation, this examiner suggests that the client's being forced to attend classic group sexual offense therapy that is normally highly confrontational, utilizes a high degree of aversive labeling (e.g. child molester, deviant, etc.), often uses group members to verbally attack members who are seen as resistant or in denial (as this client will certainly be seen), generally includes little or no individual or family therapy, and in short is very intensive and draining, is not in his or society's interest. His personal, relationship, criminal, sexual and alcohol history suggest that he is not a pedophile and requires a much more personalized and individualized approach. In essence, this examiner suggests that classic group sexual offense therapy will "miss the mark" for this client, fail to benefit his family that is badly in need of therapy as well, and may even allow the client to "skate through therapy" given its tendency to rely on rote learning of concepts and being able to essentially appear to be complying. This comment in no way is meant to reflect on the skills of Dr. Imhoff, whom this examiner finds to be a highly professional and skilled practitioner. This examiner simply believes that given the client's age, delicate health, and nature of his crime, he should not be required to attend group sexual offender therapy but should be required to attend up to three years of an alternative form of treatment as defined above.

Report Respectfully Submitted By:

*[signature]*

Stuart E. Brown, Ed.D.
State Of Washington Sexual Offense Specialist Certificate Number FC14
State of Florida Mental Health Therapist MH6907

*[signature]*

I swear under penalty of perjury based on the laws of the State of Florida, that the above is correct and true to the best of my knowledge.

**EVALUATION REPORT FOR JOHN PALMER**
**REPORT OF DECEMBER 23, 2004 - PAGE 13**

*Exhibit B*

# ALDO MORALES, M. D., P.A.
### DIPLOMATE, AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
### ADDICTION PSYCHIATRY
### PSYCHIATRY

6550 N. FEDERAL HIGHWAY
SUITE 250
FT. LAUDERDALE, FL 33308

TELEPHONE (954) 771-5410
FAX (954) 771-5695

January 10, 2005

Maury Halperin, Esq.
1326 S.E. Third Ave.
Fort Lauderdale, FL   33316

Re:    John Palmer

Dear Mr. Halperin:

I am forwarding you this letter to aid in the disposition of the case of Mr. Palmer.

I first treated him for depression and alcohol dependence at the time of his arrest in 2000. After his release from federal prison I have continued to treat him.

It is my opinion that Mr. Palmer's participation in community-based sex offender therapy as required under probation for sexual offenders is not only inappropriate but also contraindicated.

While such treatment may satisfy the legal requirements, it is totally off the mark in its clinical indication. Mr. Palmer may, indeed, harbor unconscious (or even preconscious) thoughts of a sexual nature involving minors, but to believe that these will be properly addressed in the aforementioned type of treatment is simply incorrect. Such treatment will cause him to bury his thoughts/feelings to a level where they cannot be accessed, and therefore, not processed. In short, he will never graduate.

Furthermore, given his current status as a post-operative lung cancer patient, and as a patient with significant depression, the stress engendered by traditional (focused) sex offender therapy (in an individual for whom it is not clinically indicated) decreases his fighting chance for survival. Such therapy for Mr. Palmer would be negligent and would lead to negative consequences.

January 10, 2005
Re: John Palmer
Page Two


Mr. Palmer needs to engage in comprehensive individual, marital, and perhaps family therapy in order to properly deal with his psychological problems. He requires a more global approach. We can coordinate this treatment through my office. I believe that this approach (in the case of Mr. Palmer) in lieu of the aforementioned sex offender group therapy would not, in my opinion, compromise public safety.

If you have any questions, please do not hesitate to contact me.


Respectfully submitted by

Aldo Morales, M.D.
Board Certified, Psychiatry
Board Certified, Addiction Psychiatry
Medical License #FL  ME0049538


Aldo Morales, M.D.

I swear under penalty of purgery based on the laws of the State of Florida, that the above is correct and true to the best of my knowledge.


AM/ebs/jmz/42127

STATE OF FLORIDA
COUNTY OF BROWARD
Witness my hand and official seal this 12th day of January 2005.

ELENI GANAS
NOTARY PUBLIC



Eleni Ganas
MY COMMISSION # DD197125 EXPIRES
March 26, 2007
BONDED THRU TROY FAIN INSURANCE, INC.

*Exhibit C*



# FLORIDA ATLANTIC CENTRE
# FOR PAIN MANAGEMENT
1960 N.E. 47ᵗʰ Street • 2ⁿᵈ Floor
Fort Lauderdale • Florida • 33305
Office: 954-202-6620 • Fax: 954-267-0621
facoffice@bellsouth.net

**Pain Specialists:**

Fernando Miranda, M.D.
*Diplomate American
  Board of Anesthesiology

Paul Rodriguez, D.O.
*Diplomate American
  Board of Anesthesiology

**Office Manager:**

Edward Kelly

January 12, 2005

To Whom It May Concern,

Re: John Palmer

This is to inform you that this patient should be excused from standing, sitting or any physical activity that requires a long period of time. He is status post right lungectomy for carcinoma and has begun his recovery period. The surgery was of a mediastinal nature and the pain can commonly prevail up to one year. I am ordering him to stay on his breathing exercise therapy for the next two months.

Thank you,

Paul A. Rodriguez, D.O
Pain management specialist/Anesthesiologist